Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles R. Norgle | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 2012 | **DATE** | 8/10/2000 |
| **CASE TITLE** | Colleen Dillon vs. M. S. Carriers, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Opinion and Order dated 9 August 2000. Defendant's motion for summary judgment is granted in part and denied in part.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | | number of notices |
| | Notices mailed by judge's staff. | | AUG 11 2000 |
| | Notified counsel by telephone. | | date docketed |
| ✓ | Docketing to mail notices. | | |
| | Mail AO 450 form. | ED-7 FILED FOR DOCKETING 00 AUG 10 PM 3:08 | docketing deputy initials |
| | Copy to judge/magistrate judge. | | |
| EF | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice / mailing deputy initials |

Document Number 52

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| COLLEEN DILLON | ) |
| Plaintiff, | ) |
| v. | ) No. 98 cv 2012 |
| | ) HONORABLE CHARLES R. NORGLE |
| M.S. CARRIERS, INC. | ) |
| Defendant. | ) |

DOCKETED
AUG 1 1 2000

**Opinion and Order**

CHARLES R. NORGLE, SR., District Judge:

Before the court is Defendant's motion for summary judgment. For the following reasons, the court grants the motion in part and denies it in part.

I. Introduction

1. Undisputed Facts

In August 1996, Defendant M.S. Carriers ("M.S.") employed three regional sales managers in its Midwest Division: Frank Irion, Mike Cortez, and Jeff Miller. These regional sales managers reported to Kevin Woods. After August 1996, Miller left M.S. At that time, M.S. divided Miller's territory between the two remaining regional sales managers (Irion and Cortez), increasing those manager's sales territories.

In April 1997, Plaintiff Colleen Dillon began working for M.S. as a Regional Sales Manager in M.S.'s Midwest Division. That same month, M.S. restructured the sales territories in its divisions.

As a result of this restructuring, four managers worked in the Midwest Division: Dillon, Mulloy, Irion, and Cortez. Dillon reported to Woods, who in turn reported to David Bowers.[1]

In October 1997, Mulloy left M.S., and Bowers assigned his territory to Dillon. On February 12, 1998 Dillon left M.S. to accept a higher-paying sales job with another company. Dillon's new employer required her to cover less territory than she covered while working for M.S.

2.  Procedural Background

On April 2, 1998, Dillon filed the instant suit against M.S., alleging discrimination pursuant to Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e *et seq.*) ("Title VII"). (See Compl. ¶ 1.) Specifically, Dillon claims that her M.S. supervisors sexually harassed her, and that other M.S. employees, encouraged by management, subjected her to lewd behavior (see id. ¶ 11-13); that M.S. discriminated against her on the basis of her sex and pregnancy (see id. ¶¶ 12, 14-15); and that M.S. "made [her] work requirements so excessively rigorous as to constructively discharge her from employment." (See id. ¶ 16.)

On June 1, 1998, M.S. moved to dismiss Dillon's claims of sexual harassment, pregnancy discrimination, and constructive discharge on the grounds that those claims fell outside the scope of Dillon's EEOC charge. The court denied the motion on September 14, 1998. On November 16, 1999, M.S. moved for summary judgment, and the court ordered Dillon to respond by December 10, 1999. On that day, Dillon moved for a motion to extend time for responding but also filed: (1) a Memorandum in Response to M.S.'s Motion for Summary Judgment (see Mem. in Opp.); (2) a Local Rule 12(n) Response to M.S.'s Statements of Material Fact (see Pl.'s 12(n) Resp.); and (3) a Local

---

[1] Although Bowers states in his affidavit that he worked as the former Director of Sales of M.S.'s Northern Division (and is now Vice President of Sales of M.S.'s Northern Division), there is no dispute that he directed the sales force for which Dillon worked.

2

Rule 12(n)(3) Statement of Additional Material Facts (see Pl.'s 12(n)(3) Statement of Add'l Mat. Facts). On December 13, 1999, the court denied Dillon's motion for an extension of time to respond. (See Order of Dec. 13, 1999.)

On December 17, 1999, Dillon moved to file: (1) a corrected Local Rule 12(n)(3) Statement of Additional Material Facts; (2) a corrected Memorandum in Response to M.S.'s Motion for Summary Judgment; and (3) affidavits. The court granted Dillon's motion to file those documents.

II. Discussion

1. Summary Judgment Standard

Summary judgment is permissible when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The nonmoving party cannot rest on the pleadings alone, but must identify specific facts, see Cornfield v. Consolidated High Sch. Dist. No. 230, 991 F.2d 1316, 1320 (7th Cir. 1993), that raise more than a mere scintilla of evidence to show a genuine triable issue of material fact. See Murphy v. ITT Technical Servs., Inc., 176 F.3d 934, 936 (7th Cir. 1999). Indeed, a party opposing summary judgment must do more than raise a "metaphysical doubt" as to the material facts. See Gleason v. Mesirow Fin., Inc., 118 F.3d 1134, 1139 (7th Cir. 1997) (citing Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

Summary judgment is appropriately entered against a party that fails to demonstrate the existence of an essential element of that party's case. See Gleason, 118 F.3d at 1139 (citing cases). Put another way, summary judgment is the stage of a lawsuit where a party must present evidence that could convince a trier of fact to accept his version of events. See Shank v. William R. Hague,

Inc., 192 F.3d 675, 682 (7th Cir. 1999) (citing Schacht v. Wisconsin Dep't of Corrections, 175 F.3d 497, 503-04 (7th Cir. 1999)). In deciding a motion for summary judgment, the court can only consider evidence that would be admissible at trial under the Federal Rules of Evidence. See Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir. 1996). The court views the record and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party. Fed. R. Civ. P. 56(c), see also Hill v. American Gen. Fin., Inc., No. 99 C 2682, 2000 WL 536670, at *2 (7th Cir. May 4, 2000); Perdomo v. Browner, 67 F.3d 140, 144 (7th Cir.1995). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice of inferences." See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 280 (1968); Wolf v. Buss (America) Inc., 77 F.3d 914, 922 (7th Cir. 1996). The choice between reasonable inferences from facts is a jury function. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). That said, the court first addresses whether Dillon's pregnancy discrimination and constructive discharge claims survive M.S.'s motion for summary judgment.

Dillon claims that she was the victim of disparate treatment. Thus, Dillon bears the ultimate burden of proving that M.S. intentionally took an adverse employment action against her because of her pregnancy and/or gender. See Cianci v. Pettibone Corp., 152 F.3d 723, 726 (7th Cir.1998). In order to avoid summary judgment, Dillon could present either direct evidence of discrimination, such as a "smoking gun" admission, or present indirect evidence under the three-step burden-shifting method set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). See Wallace v. SMC Pneumatics, Inc., 103 F.3d 1394, 1397 (7th Cir. 1997). Under the burden-shifting McDonnell Douglas method, Dillon must demonstrate that: (1) she belongs to a protected class; (2)

4

she performed her job satisfactorily; (3) she suffered an adverse employment action; and (4) her employer treated similarly-situated employees outside of his protected class more favorably. Stockett v. Muncie, Ind. Transit Sys., No. 99 C 2692, 2000 WL 1023590, at *2 (7th Cir. July 21, 2000) (citations omitted). A plaintiff making this showing creates a "presumption that he was discriminated against, and the employer must come forward with a legitimate, non-discriminatory reason for the employment action." Id. (citing McDonnell Douglas, 411 U.S. at 802; Lenoir v. Roll Coater, Inc., 13 F.3d 1130, 1133 (7th Cir. 1994). "At this stage . . . an employer 'need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus.'" Id. (citation omitted). Once a defendant meets its burden of production, the plaintiff must prove by a preponderance of the evidence that the defendant's reason for its employment decision is merely a pretext for discrimination. See id. (citations omitted). Under either method, Dillon must demonstrate that, but for her pregnancy or gender, M.S. would not have would not have increased her territory to such an extent. See id.; see also Bahl v. Royal Indemnity Co., 115 F.3d 1283, 1290 n. 8 (7th Cir. 1997).

Pregnancy and Sex Discrimination Claim

Dillon claims that she has both direct and indirect evidence of discrimination, that is, that M.S. intended to make work so unbearable for Dillon that she would quit. Dillon maintains that M.S. wanted her to quit because she was pregnant and a mother of two. In support of her claims, Dillon provides several affidavits. In one of the affidavits Dillon provides, Robert Hall, who worked in sales for M.S. from 1994 to April 1998, states that

> (1) during August of 1997, Woods, Hall's division manager, offered Hall Dillon's job, stating that Dillon would not be returning from maternity leave (see id. ¶ 4);

5

(2) one month after Hall received the offer to replace Dillon, Bowers called him and offered him a 10% increase in pay to resume Dillon's responsibilities (see id.);
(3) Woods told him that M.S. was increasing Dillon's sales territory and would make it very difficult for her to return with two children (see id.);
(4) Woods and Bowers told him that Dillon could not return to work or do her job with two children (see id. ¶¶ 4, 5);
(5) Woods told him to encourage Dillon not to return to M.S. after her 1997 maternity leave (see id. ¶ 5);
(6) Woods told him to suggest to Dillon that if she requested six months severance pay with benefits it would be accepted if she left the company, and that "they wanted her to create an acceptable severance package to avoid having to terminate her." (Id.); and
(7) During August of 1997, Woods reported to Bowers who reported to Woody Welch (see id. ¶ 6.)

In another of the affidavits submitted by Dillon, Mulloy, the salesman who left M.S. in October 1997, states that in his opinion, "if Ms. Dillon were assigned both hers and my territories she would be spread too thin and both territories would experience a decrease in volume." (Mulloy Aff. ¶ 5.) Mulloy also states that when Miller left M.S., M.S. split his territory (which was one-third the size of Mulloy's territory) between two salespersons. (See id.) Furthermore, he asserts that Woody Welch told him that "women do not belong in the transportation business, especially sales. There is no doubt that he was referring to Ms. Dillon." (Id. ¶ 6.) In Mulloy's opinion, M.S. changed its attitude toward Dillon after they became aware of her pregnancy in 1997. (See id. ¶ 8.) Mulloy then describes an instance in which Woods treated Dillon rudely for being 30 seconds late for a conference call and "said that he [Woods] wouldn't fucking tolerate crap from her and just because she had a kid and was pregnant she could not make her own rules." (Id. ¶ 9.)

M.S., on the other hand, argues that only sound business reasons motivated the decision to increase Dillon's territory. According to David Bowers, he decided that Dillon was the appropriate

6

sales manager to assume Mulloy's abandoned territory upon Mulloy's departure. In his affidavit, Bowers states that

> With input from Kevin Woods, I decided that Colleen Dillon would assume Mr. Mulloy's former sales territory. I made this decision in large part because Colleen Dillon worked out of the same Chicago, Illinois office as Mr. Mulloy had. Ms. Dillon had also previously worked the Minnesota and Wisconsin markets while at M.S. Carriers and was more familiar with those markets than any other regional sales manager in the company at that time. In addition, the sales territories of Frank Irion and Mike Cortez had recently been increased because of Jeff Miller's departure. Mr. Irion and Mr. Cortez worked out of Columbus, Ohio, and would not have been able to handle adequately their sales territories and Mr. Mulloy's former sales territory in the Upper Midwest.

(Bowers Aff., Def. Stmt of Mat. Fact, Ex. 2 ¶ 8.) Notably, in her deposition, Dillon agrees that she was the most appropriate person to fill Mulloy's vacated territory:

> Q: When Greg Mulloy left, of the remaining salespersons, who was in the most appropriate position to fill his position if the company did not hire an outside salesperson?
>
> * * *
>
> A: Well, I mean logistically, I was the closest one to the territory so I guess me.
> Q: You were the closest one to the territory, and you were also someone who had worked that territory before?
> A: Yes.
> Q: Do you have any knowledge as to whether the company has combined or increased the sales territories when other salespersons have left?
> A: I believe. Yes, I'm sure. I believe so.

(Dillon Dep. at 180.)

Bowers also states that he read Dillon's deposition in which she maintains that Bob Hall, another regional sales manager, should have received an increase in his sales territory when Mulloy departed. (See id. ¶ 9.) In response to this testimony, Bowers states that at the time he increased Dillon's sales territory in October 1997, Hall worked in M.S.'s Southwest Division and was not

7

subject to Bowers' supervision. (See id.) Furthermore, Bowers states that Hall worked out of Kansas City, Missouri, which is farther from Mulloy's territory (Wisconsin and Minnesota) than Dillon's home base of Chicago. (See id.) In sum, Bowers asserts that at the time of his decision to increase Dillon's territory, he viewed Dillon as the most qualified person to receive Mulloy's territory, and that Dillon's pregnancy and subsequent maternity leave played no part in his decision. (See id.)

But Bower's affidavit does not negate the affidavits of Hall and Mulloy. Indeed, those affidavits indicate that genuine issues of fact exist as to why M.S. increased Dillon's territory. On this record, the court cannot conclude that M.S. increased Dillon's territory solely for business reasons. The court also notes that Dillon's acceptance of a better paying job with a smaller sales territory upon departing M.S. (see Dillon Dep. at 29-30, 39, 44-45, 201-02) does not eliminate the possibility that M.S. may have discriminated against her. Accordingly, the court denies M.S.'s motion for summary judgment as to Dillon's pregnancy and sex discrimination count.

Constructive Discharge Claim

Next, the court examines Dillon's constructive discharge claim. "The term 'constructive discharge' refers to the situation in which an employer, without firing and employee, makes his working conditions so miserable that it drive him to quit." Hunt v. City of Markham, Ill., No. 97 C 5620, 2000 WL 968540, at *5 (7th Cir. July 11, 2000) (citations omitted). "To establish a claim for constructive discharge under Title VII, a plaintiff must prove that his working conditions were so intolerable as a result of unlawful discrimination that a reasonable person would be forced into involuntary resignation." Tutman v. WBBM-TV, Inc./CBS, Inc., 209 F.3d 1044, 1050 (7th Cir. 2000) (citing Vitug v. Multistate Tax Comm'n, 88 F.3d 506, 517 (7th Cir.1996)); see also Bragg v. Navistar Int'l Transp. Corp., 164 F.3d 373, 377 (7th Cir. 1998) ("To show constructive discharge,

8

a plaintiff must establish that: (1) the conditions at work were so intolerable that a reasonable person would have been compelled to resign; and (2) the working conditions must be intolerable in a discriminatory way.") (citing Harriston v. Chicago Tribune Co., 992 F.2d 697, 705 (7th Cir. 1993)); Chambers v. American Trans Air, Inc., 17 F.3d 998, 1005 (7th Cir. 1994). Furthermore,

> [w]orking conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because "in the 'ordinary' case, an employee is expected to remain employed while seeking redress."

Tutman, 209 F.3d at 1050 (quoting Drake v. Minnesota Mining & Mfg. Co., 134 F.3d 878, 886 (7th Cir.1998)).

In her constructive discharge claim, Dillon alleges:

> Upon becoming pregnant a second time Plaintiff's workload and travel expectations were increased. She was also instructed to drive great distances and spend an inordinate amount of time away from her home and family.
>
> Defendant made Plaintiff's work requirements so excessively rigorous as to constructively discharge her from her employment.

(Compl. ¶¶ 15-16.) Despite focusing her constructive discharge claim on her increased sales responsibilities, in her Corrected Memorandum of Law in Response to Defendant's Motion for Summary Judgment, Dillon states: "Plaintiff testified that the only reason she left [M.S.] was because of the harassment that Kevin Woods and the management were putting on her[, and] Plaintiff felt because of the continual harassment she was being forced to leave . . . ." (Corrected Mem in Opp. at 3-4.) However, as seen below, Dillon is barred from bringing any claims based on sexual harassment because she included no sexual harassment allegations in her EEOC charge. See discussion infra, at 10-16.[2]

---

[2] The court notes that had Dillon's Title VII constructive discharge claim based on sexual harassment not been barred, it would not succeed. The court finds nothing in Dillon's Memorandum

The question then becomes whether Dillon's increased workload and travel "were so intolerable as a result of unlawful discrimination that a reasonable person would be forced into involuntary resignation." Tutman, 209 F.3d at 1050.³ Other than the blanket statements that her territory and travel requirements increased, Dillon fails to show how her increased sales territory and travel requirements negatively affected her working conditions. She offers nothing in either her Memorandum or in her Statement of Additional Facts to indicate that her new responsibilities were so intolerable that a reasonable person in the same situation would have quit. Notably, she fails to quantify, in any way, how her expanded territory impacted her working conditions. C.f. Darnell v. Target Stores, 16 F.3d 174, 179 (7th Cir. 1994) (plaintiff failed to demonstrate the adverse employment action of constructive discharge where plaintiff "showed only that his job was difficult, and required him to work long hours and perform unpleasant tasks and that . . . he labored under an insufferable boss."). Because Dillon presents nothing but conclusory statements about her increased workload, she fails to demonstrate that her increased responsibilities were so intolerable that they would have forced a reasonable person to quit. Accordingly, her constructive discharge claim fails.

Sexual Harassment Claim

Next, M.S. argues that Dillon's sexual harassment claim falls outside the scope of her EEOC charge and that Dillon should not be allowed to proceed on that claim. The court again notes that early in this case, M.S. moved to dismiss Dillon's sexual harassment claim, arguing that her EEOC

---

(see Corrected Mem. in Opp. at 3-4) or in her Statement of Additional Facts (see Pl.'s Corrected 12(n)(3) Statement of Add'l Mat. Facts) that is so egregious and intolerable (even taken collectively) that would force a reasonable person to quit under those circumstances.

³ The court again notes that Dillon left her M.S. job to accept a higher-paying sales position that required less travel, but that fact plays no part in the court's analysis.

10

charge included no such claim. The court construed Dillon's EEOC charge with "utmost liberality," and concluded that the scope of the EEOC charge includes a sexual harassment claim. (See Order of Sept. 14, 1998.) The court revisits that decision here.

On January 7, 1998, Dillon met with the intake personnel at the Illinois Department of Human Rights ("IDHR"). During this meeting, Dillon presented the IDHR with a charge questionnaire and eleven typewritten pages of allegations that included examples of sexual harassment. (See Order of Sept. 14, 1998.) The IDHR intake personnel then helped Dillon prepare and file an EEOC charge with the IDHR and the EEOC. (See id.) Dillon's EEOC charge alleges:

> I.     A. ISSUE/BASIS
>
>> 1. SALES TERRITORY INCREASED ON OR ABOUT OCTOBER 13, 1997, BECAUSE OF MY SEX, FEMALE.
>
> B. PRIMA FACIE ALLEGATIONS
>
>> 1.     My sex is female.
>>
>> 2.     I am a satisfactory employee performing the job duties of a regional sales representative in a manner that is consistent with Respondent's standards. I was hired in March of 1993.
>>
>> 3.     On or about October 13, 1997, my sales territory was increased. No reason was given for the increased [sic] in sales territory.
>>
>> 4.     A similarly situated employee Bob Hall (male) whose job performance is comparable to mine has not had his sales territory increased.

(Dillon EEOC Charge, Def. Stmt of Mat. Fact, Ex. 1, Attachment 1.) And in Dillon's questionnaire, the closest she comes to mentioning sexual harassment is: "In April I had a new boss assigned to me and I was 6 mos. pregnant. He harassed me from that day." (Questionnaire, Def.'s Stmt of Mat.

11

Facts, Ex. 1, attachment 2.) Dillon's 11 pages of notes includes descriptions of instances of sexual harassment.

The recent Seventh Circuit case <u>Vela v. Village of Sauk Village</u>, provides guidance as to what a court may examine when construing an EEOC charge. <u>See</u> No. 99 C 3262, 2000 WL 804554 (7th Cir. June 22, 2000). In that case, the plaintiff, Vela, a female police officer employed by Sauk Village, alleged that she suffered disparate treatment at the hands of her employer because of her sex and national origin, retaliation for filing a charge of discrimination against the Village, and sexual harassment. <u>See id.</u> at *1. The district court granted summary judgment in favor of Sauk Village, and Vela appealed, raising, along with another issue not pertinent here, "whether Vela can pursue in this Title VII action a claim of sexual harassment which she made orally to an agency representative, but which the representative omitted from her [EEOC] charge when he typed it . . . ." <u>Id.</u>

The facts surrounding Vela's EEOC charge are as follows:

> Vela has been a police officer for the Village since April 1993. In November 1997, she filled out an intake form at the Illinois Department of Human Rights (IDHR) as a preliminary to an EEOC charge against the Village. In response to one question as to the type of discrimination she wanted to have investigated she circled "unequal terms and conditions". She also circled "harassment" and "failure to promote", but these were crossed out. She testified that the IDHR intake officer crossed them out and told her to initial the cross-outs, although she had orally informed him of the conduct she claimed constituted sexual harassment. In response to a question why she felt she was discriminated against, she wrote only "See attached copies/pages", but those are not in the record, nor is there testimony describing their contents.

> Two days later Vela filed with IDHR (an EEOC designated agency, 29 C.F.R. §§ 1601.74; 1601.80) a charge of discrimination. On the form she checked "sex" and "national origin" as bases of discrimination against her. In the part of the form asking for the "particulars", she listed three incidents in which she was treated differently from non-Mexican male officers: being required to take a drug test after an accident with a squad car, being reprimanded for failing to follow a work procedure, and being reprimanded for failing to use "spell check". The charge, which she testified was

12

> typed by the intake officer, did not describe the harassing conduct which she said she had described to him.

Id. at *1.

On appeal, Vela argued that checking "sex" as a basis of discrimination sufficiently raised sexual harassment in her EEOC charge. See id. at *2. The Seventh Circuit disagreed, stating,

> "As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that are not included in her EEOC charge.... For allowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would frustrate the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge." Cheek v. Western and Southern Life Ins. Co., 31 F.3d 497, 500 (7th Cir.1994). "Because an employer may discriminate on the basis of sex in numerous ways, a claim of sex discrimination in an EEOC charge and a claim of sex discrimination in a complaint are not alike or reasonably related just because they both assert forms of sex discrimination." Id. at 501.

The court concluded that: (1) Vela's sexual harassment claim in her Complaint was diverse from the disparate treatment described in her EEOC charge: (2) her sexual harassment claim was not reasonably related to the EEOC charge; and (3) the EEOC charge was not an "adequate predicate" for her sexual harassment claim. Id. (Citing Sauzek v. Exxon Coal USA, Inc., 202 F.3d 913, 920 (7th Cir. 2000) (employer's decision to terminate worker not reasonably related to subsequent decision not to rehire worker during a recall); Novitsky v. American Consulting Engineers, L.L.C., 196 F.3d 699, 701-02 (7th Cir. 1999) (claim of failure to accommodate plaintiff's religion not reasonably related to EEOC charge discussing discrimination on bases of age and religion, even where plaintiff described in intake form an incident that supported her failure to accommodate theory); cf. Jenkins v. Blue Cross Mut. Hosp. Ins., Inc., 538 F.2d 164, 167-69 (7th Cir. 1976) (en banc) (plaintiff sufficiently alleged facts supporting claim of sex discrimination in EEOC charge to proceed with sex

13

discrimination claim in court, despite plaintiff's failure to check the box for sex discrimination on the charge).[4]

The Vela court noted examples of when courts have examined materials beyond the EEOC charge form in determining what is included in the EEOC charge. The court iterated the rule: "'Allegations outside the body of the charge may be considered when it is clear that the charging party intended the agency to investigate the allegations.'" Id. (quoting Cheek, 31 F.3d at 502 (in turn citing Rush v. McDonald's Corp., 966 F.2d 1104, 1110-11 (7th Cir. 1992) (plaintiff's handwritten "EEOC Affidavit" submitted the same day as her EEOC charge) and Box v. A & P Tea Co., 772 F.2d 1372, 1375 (7th Cir. 1985) (handwritten additions to typed charge)) and citing Sickinger v. Mega Systems, Inc., 951 F. Supp. 153, 157-58 (N.D. Ind. 1998) (Charge Questionnaire, filled out the same day as the charge was filed, under particular circumstances where the employer could not claim surprise at the claim stated fully in the questionnaire, but not in the charge).[5] The court noted that in all of the above examples, the allegations not contained in the EEOC charge were in writing. See id.

Vela argued that she orally told the EEOC intake officer the facts of her sexual harassment, but he directed her to cross out the reference to harassment on her intake form, and that he misled her in doing so. However, the Vela court held that given the facts of Vela's conference with the EEOC intake officer, her oral charge of harassment, which was not reflected nor reasonably related to her filed EEOC charge, was "not a sufficient predicate for a claim of sexual harassment in her civil action." Id. at *3. The court noted that 42 U.S.C. § 2000e-5(b) requires that "'[c]harges shall be in

---

[4] Summaries of cited cases are those of the Seventh Circuit's in Vela.

[5] Again, summaries of cited cases are those of the Seventh Circuit's in Vela.

14

writing under oath or affirmation' and 29 C.F.R. § 1601.9 makes the same requirement." Id. The court found no case suggesting that an oral statement to an agency representative is sufficient. See id. Importantly, "[N]otice of such a statement cannot be expected to reach the employer." Id. (citing Novitsky, 196 F.3d at 702 (court rejects plaintiff's reliance on information written on intake form but not included in charge, where plaintiff had opportunity to read charge and obtain professional advice regarding it, and signed charge)).

In the case sub judice, Dillon argues that

> Plaintiff, in her deposition, testified that she provided additional information to the EEOC intake officer, and that he did not include them in her signed charge. In fact, Plaintiff had testified that on the intake questionnaire she indicated sexual-pregnancy discrimination and sexual discrimination.

(Pl.'s Corrected Mem. in Resp. at 6 (citing Dillon Dep. at 197-99; Ex. A to Pl.'s Rule 12(n) Stmt of Mat. Facts).) Dillon also asserts that her "EEOC charge, related typed statements given to the EEOC, and her questionnaire contains allegations of discrimination and harassment directed at Plaintiff by Defendant and its supervisors." (Id. at 7.) However, Dillon clearly omitted a sexual harassment allegation in her EEOC charge. See supra pp. 8-9. Likewise, her questionnaire (even though it contains the language, "In April I had a new boss assigned to me and I was 6 mos. pregnant. He harassed me from that day" (Questionnaire, Def.'s Stmt of Mat. Facts, Ex. 1, attachment 2)), fails to indicate an intention to bring a sexual harassment claim rather than one of pregnancy discrimination.

Finally, the 11 typewritten pages of allegations (which included examples of sexual harassment) that Dillon presented (or, to use Dillon's word, "gave") to her EEOC intake officer are indistinguishable from the oral representations In Vela. Dillon's personal notes, like Vela's oral

15

comments, were not given under oath or affirmation. See Vela, No. 99 C 3262, 2000 WL 804554, at *3 (citing 42 U.S.C. § 2111e-5(b); 29 C.F.R. § 1601.9). Nothing in the record indicates that Dillon's notes have any greater (or even different) effect on EEOC intake personnel than oral comments made at an intake conference. Certainly, making allegations to the EEOC in writing, as opposed to orally, does nothing to increase the effectiveness of notice of her claims to M.S. See id. And Dillon does not even claim, as Vela did, that the EEOC intake personnel misled her; Dillon simply asserts that she provided him with more information than what ended up being included in her charge. In short, Dillon's sexual harassment claim is wholly diverse from those claims asserted in her EEOC charge, and no reasonable relationship exists between her sexual harassment claim and her EEOC charge. See id. at *2. The court thus concludes, despite previously denying M.S.'s motion to dismiss this claim on the same basis, that Dillon's sexual harassment claim falls outside the scope of her EEOC charge. Accordingly, the court grants M.S.'s motion for summary judgment as to Dillon's sexual harassment claim.

III. Conclusion

For the foregoing reasons, the court denies M.S.'s motion for summary judgment as to Dillon's pregnancy discrimination claim. The court grants M.S.'s motion for summary judgment as to Dillon's constructive discharge claim and her sexual harassment claim.

IT IS SO ORDERED.

ENTER: 8-9-00

*[signature]*
CHARLES RONALD NORGLE, SR., Judge
United States District Court

DATED: 8/9/00